# CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

## STATE OF LOUISIANA

CASE NO: 2023 - 02041                                     DIVISION: A

Dr. BORIS ODYNOCKI

V.

SOUTHERN UNIVERSITY AT NEW ORLEANS, DR. DENNIS J. SHIELDS, PRESIDENT-CHANCELLOR, SOUTHERN UNIVERSITY SYSTEM, DR. JAMES H. AMMONS, JR., CHANCELLOR OF SOUTHERN UNIVERSITY AT NEW ORLEANS (SUNO), DR. GREGORY FORD, VICE-CHANCELLOR FOR ACADEMIC AFFAIRS (SUNO)

FILED:_____                                              DEPUTY CLERK_____

## **COMPLAINT AND JURY DEMAND**

NOW INTO COURT comes plaintiff *pro se*, Dr. Boris Odynocki, who files this complaint and represents the following:

1. The plaintiff is 82 years old man domiciled in the Parish of St. Tammany, State of Louisiana. He holds a Ph.D. Candidacy and M.A. in sociology from Graduate School/ the City University of New York, M.S. in sociology of work/management from the University of Lodz, and a Ph.D. degree in social(health) policy planning/systems analysis from Penn. He is the author of numerous scholarly papers.

2. Dr. Odynocki received the tenured appointments in sociology in 1986, and in management at SUNO's College of Business in 1991.

3. The petitioner has an excellent record of performance at this university during his 40 years of service.

4. Plaintiff brings this action against the Southern University at New Orleans and the defendants by claiming *age discrimination* under *Louisiana Commission on Human Rights Act (LCHRA) LSA-R.S.23:312(A)(1)* and the federal *Age Discrimination in Employment Act of 1967 (ADEA)* as amended (Pub 90-202) Sec. 621 [Section 2] LCHRA is a mirror image of the ADEA.

**Exhibit A**

1

The ADEA acknowledges the existence of "arbitrary discrimination in employment because of age..." *Prohibition of Age Discrimination 20 U.S.C. Sec.623 [Sec 4(a)]*. According to this law, *"It shall be unlawful for an employer to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age."*

## THE FACTS

5. On February 11, 2023, petitioner was removed from his tenured position of associate professor of sociology for being "unethical and immoral", for "neglect of duty", for "incompetence", and for "the failure to perform duties in a professional manner". (Exhibit 1)

6. The plaintiff claims that such accusations were used by the defendants as a pretext for his removal from the tenured position he occupied since July of 1983 because of his age.

7. Such an action is forbidden, as was shown above, by both *Louisiana Commission on Human Rights Act* and *The Age Discrimination in Employment Act 1967* (ADEA) as amended *(Pub. L. 9—202) Sec. 621 [Section 2]*.

8. On November 2, 2021, Dr. Gregory Ford, Vice-Chancellor for Academic Affairs called the plaintiff to a meeting and announced with disdain that he suspends the plaintiff from his teaching duties indefinitely, and his courses he assigns to a younger, un- qualified instructor. The purpose of the move was, supposedly, to investigate "multiple grievances filed by students this semester". (Exhibit 2)

9. But he was unable to produce even one grievance filed by the students or staff when asked by the plaintiff to do so. He lied.

10. The plaintiff was also forbidden from visiting the SUNO campus, his office, denied access to the faculty meetings, and barred from contacts with his students, faculty, staff, or a "supervisor". (Exhibit 2)

11. As the defendant spoke, he demonstrably bared his teeth to the plaintiff, deliberately showing his hatred of him.

2

12. On December 15, 2021, during one of the telephone conversations with the plaintiff, Dr. Ford asked him to retire.

13. On January 4, 2022, plaintiff discovered that Dr. Ford removed plaintiff's name from the payroll without explanation.

14. On January 31, 2022, plaintiff filed a complaint against the defendants in the United States District Court of Louisiana for illegal dismissal from his tenured position. (No: 22-209)

15. Plaintiff was immediately reinstated.

16. But a surprise was waiting for him! There were no courses scheduled for him to teach in the fall semester of 2022. In August of that year, plaintiff's name was removed from the SUNO payroll again without warning. He filed a complaint against defendants in the U.S. District Court again and was reinstated again. (No: 2:22-cv-02695)

## DENIAL OF FAIR HEARINGS (DUE PROCESS)

17. On September 11,2022, Dr. Ford invited plaintiff to the Investigatory Panel Hearing.

18. The setup of the hearing, however, was rife with irregularities and due process violations spelled out in rules 4.9.1. and 4.9.1. in the SUNO Faculty Handbook.

19. "Informal inquiry by a duly *elected faculty committee* chosen by faculty within the academic unit" is required by the Rule 4.9.1 but ignored by Dr. Ford.

20. Hence, the plaintiff demanded from Dr. Ford a full compliance with the requirements of the rule. That is:

a. To make known the names of the 7 members of the Investigatory Panel and their departmental affiliations before the panel is called into session. The defendant ignored this request.

b. To reveal the name and telephone number of the member of the American Association of University Professors invited to the hearing. This was an explicit requirement of Rule 4.9.1.(6) It says: *"At the request of either party or the panel, a representative of responsible educational association shall be permitted to attend*

3

*proceedings as an observer.*" The defendant ignored this request also. No representative of the AAUP or any other scholarly organization was invited.

c. Plaintiff also asked Dr. Ford to explain the charge of Neglect of Duty since the text of the charge was fuzzy and confusing to the plaintiff. This request was ignored as well. (See Exhibit 3: The Rebuttal..., p. 2)

d. The plaintiff also asked Dr. Ford to make available to him the list of witnesses to be questioned, whose accusations he had sent to plaintiff. No list of witnesses was provided.

e. Rule 4.9.2 requires that "A formal hearing for dismissal will be preceded by a statement of reasons therefore, and the individual concerned **_will have the right to be heard initially by the elected faculty hearing committee._** This requirement was ignored as well. (p.57)

f. Furthermore, the rule 4.9.2 demands that "Pending a final decision by investigatory panel the faculty member will be suspended, or assigned to other duties in lieu of suspension, *only if immediate harm to himself/herself or others is threatened by his/her continuance.*" No immediate harm was present. The plaintiff has been banished from the campus for ever for no reasons given. (See Exhibit 4)

g. "During the proceedings the faculty member will be permitted to have an academic advisor...". No advisor was present, however, since plaintiff was forbidden by Dr. Ford to contact faculty and staff "to discuss these proceedings". (See Exhibit 5: Letter of Nov. 11, 2021)

h. The plaintiff's rebuttal of charges made by Dr. Ford (Exhibit 3) were never made available to the members of the Panel as required by procedural Rule 4.9.2 (8). [It says: **_"The burden of proof that adequate cause exists rests on the institution and shall be satisfied only by clear and convincing evidence in the record considered as a whole."_**]

i. Dr. Ford also refused to disclose who among the committee members was appointed by the Faculty Senate.

4

j. As a result, Dr. Ford transformed the University's due process hearing into the circus with himself as its main manipulator.

k. Plaintiff made it clear to Dr. Ford that meeting the above requirements are preconditions for his participation in the proceedings of the Panel.

21. Dr. Ford ignored plaintiff's demands, thus **denying** the plaintiff right to **a fair hearing** *(the due process).*

22. Consequently, the Investigatory Panel has failed to carry out its evidentiary burden of proof. The facts "uncovered" by the Panel were fabricated, and so the conclusions arrived at by the Panel were false. (Exhibit 6).

23. The rule 4.9.2(12) also demands that "In the hearing of charges of incompetence, the testimony shall include that of qualified faculty members from this or other institutions of higher education."

24. The above rule was ignored as well. Not one member of the Panel has had the requisite credentials in sociology.

25. On October 12, 2022, Ms. Corine Blanche, a legal representative of SUNO, asked plaintiff to retire/resign from the University. He declined. (Exhibit 6)

26. By engaging in an effort to force Dr. Odynocki to resign/retire and by bullying him and harassing him into it, plaintiffs violated *the Louisiana Commission on Human Rights Act (LCHRA)* and *the Age Discrimination in Employment Act of 1967 (ADEA)*which prohibit such practices.

27. When on January 10,2023 the plaintiff went to the SUNO Administration Building to learn of his employment status at the University and receive his teaching evaluations, two armed campus policemen stopped him and asked to immediately leave the campus and never come back.

28. It becomes obvious that Dr. Odynocki's tenured position had been terminated without the due process required by the SUNO bylaws. And yet, according to the Bylaws and Regulations, "tenure appointments are for an indefinite period of time... It does assure that the employee will not be dismissed without ***adequate*** justification and without due process. (Chapter II, Section 2-8, 3).

5

29. Furthermore, the historical purpose of tenure was the protection of **academic freedom by preventing arbitrary or repressive dismissal**. Quinlan, *State Teacher Tenure Statutes: An Appeal for Repeal,* 9 J. Legislation 144 (1982).

30. It has been demonstrated convincingly that plaintiff was terminated for coarsely fabricated cause.

31. Internal appeals were ignored by Dr. Dennis Shields, the President-Chancellor of Southern University, and Dr. James Ammons, Chancellor of SUNO.

32. Dr. Odynocki's contractual rights as tenured professor were violated in the following non-exclusive particulars:

a. Termination without validated or authenticated causes.

b. Termination without the reason justified by *the Bylaws and Regulations of the Board of Supervisors of Southern University System* (herein after *Bylaws and Regulations of the Board*).

c. Denial of the right to teach freely without interference, established by the *Bylaws and Regulations of the Board*, dictated by defendants' and some students' ignorance and resulting inability to understand certain sociological concepts (as was the case with deviant behavior).

d. Violation of his right to due process by SUNO's failure to follow its own regulations and bylaws regarding termination of plaintiff's employment at SUNO.

e. Brazenly ignoring the rule that obliges the defendants:" ***Notice of termination shall be provided to a tenured member of the faculty no less than the equivalent of one academic year prior to the effective date of the termination of employment***". *Bylaws and Regulations of the Board, Chapter II, Section 2-8, tenured faculty (1), p. 42*. It is strange that this violation of the faculty member's right comes from the people who continuously demand "equal rights" for themselves but deny them to others.

### "FINDINGS" of THE INVESTIGATORY PANEL: FACTS and FICTION

33. The report of findings by the Panel is misleading with erroneous conclusions. It is full of blunders - both logical and factual.

6

34. **WITNESS 1: Dr. Ashley Ojo:** Decision to "provide reasonable accommodations" to a suffering student is within the authority and **discretion** of the professor teaching the course. Denial of the request is not a misconduct, however, as witness presumes, that supports the charge of "unethical and immoral behavior", "neglect of duty" (professor is not a social worker, has no duty to accommodate students when they cannot attend classes), it is not a proof of "incompetence" to teach sociology or management courses as well, and it is not a proof of "failure to perform duties in professional manner." According to SUNO's regulation, "All students are expected to attend regularly and punctually, all classes in which they are enrolled." (*See SUNO 2018-2020 Catalog, p. 92*)

35. To the best of the plaintiff's recollection, the student, Ms. Kara Smith, did request permission to study in his class long distance, to which the course was not designed. Yet, her request was granted in full. She dropped out from the class anyway without completing a single assignment. As it is, Dr. Ojo's testimony is a lie. Plaintiff informed Dr. Ojo by phone of the student's "progress" in the course.

36. "He did not respond to her (Dr. Harrell) emails...". Where is the proof? "Exhibited rude behavior to students." Did she witness such a behavior? When? Where? What are the names of the students? Let students speak for themselves. There is no clear and convincing evidence of misconduct.

37. He did not attend meetings. To the best of the plaintiff's recollection, he did attend meetings. One of them he recalls vividly. The Committee of the Faculty Concerns was supposed to present concerns of the faculty during the meeting. One of these concerns was the existence at SUNO of two track promotion system: one for Black faculty and another for everybody else (*reverse discrimination*). The presentation was supposed to be made by the chair of the committee. But it was never made. Dr. Harrell declared abruptly that the man was called to another important meeting.

7

38. Dr. Ojo has never attended plaintiff's classes and is therefore an incompetent witness. "Abuse" of students? What exactly students? What exactly verbal abuse? What does exactly "discriminatorily unethical/race related issues" phrase mean? Dr. Ojo does not explain. Did she witness firsthand the plaintiff's class presentations? No. In sociology class, a sociologist must discuss "unethical/race related issues" because that what sociology is all about. In this country race relations were always unethical, and this is why they are debated in college classrooms and outside of them endlessly.

39. Dr. Ojo's testimony is both dishonest and uninformed. Where is clear and convincing evidence of *"unethical and immoral"* behavior? Where is the proof of *"neglect of duty"*? Where is here the confirmation of *"incompetence"*? Where is *"the failure to perform duties in a professional manner"*? Dr. Ojo has no answers to these questions.

40. **Witness 2: Ms. Chelsea Lewis**: The witness flanked the course because she submitted her assignments ***after*** the semester had ended and grades were posted on the SUNO website (as required by SUNO regulations). She knew when semester ends from the very beginning of the term. She also refused to take make up exam. She appealed her grade to the department chair and dean without success. Most recently, Dr. Ford appointed a special panel to review her grade. The committee found nothing objectionable in plaintiff's grading as well. (See Exhibit 6: Recommendation of the Student Grievance Committee to Dr. Ford of December 7, 2021).

41. Testimony of the witness 2 revealed no *signs of misconduct in plaintiff's work. There was no proof of "unethical* and immoral behavior." There was no *"neglect of duty"*. There was no clear and convincing evidence of *"incompetence"*. There was no proof of *"the failure to perform duties in a professional manner"*.

42. **Witness 3: Mr. Martez Lynch**: In the Fall of 2019, this witness took plaintiff's class in Medical Sociology. On October 24 of that year, plaintiff asked students to

submit the first drafts of their term papers for his review. Since Mr. Lynch's paper was written in an inappropriate format, he was asked to re-write it.

43. To this, Mr. Lynch yanked his paper from plaintiff's hand, returned to his seat and exploded like a volcano. His mouth spewed out rocks of profanities and lava of insults. The student accused his professor (plaintiff) of not knowing how to teach, and that he, the student, will tell the plaintiff "from now on" how to teach.

44. Then Mr. Lynch ran out of the classroom into the corridor of the building, and like a caged animal began running from one end of the building to another shouting invectives and spitting out scorn on the professor, clearly trying to intimidate him.

45. Plaintiff reported this happening to the campus police who wrote a report of the incident. (Exhibit 8) The student continued in Medical Sociology class as a rare visitor, however. Once he tried to push several typed pages into plaintiff's face *after* the class to elude a required presentation. The plaintiff avoided speaking to Mr. Lynch after the incident in fear of triggering violence. This witness' testimony during the hearing (he said/I said) is complete fabrication.

46. The student received FX for this class because of the excessive absenteeism. According to the University regulation, *"When a student receives a total of four unexcused absences in a given class, the student may be given the grade of "F" at the instructor's discretion."* (See *SUNO 2018/2020 Catalog, p.93*) and because of the **"academic misconduct" and disruption/obstruction of "orderly conduct of University affairs, including teaching"**. (*Student Handbook, 2016-2018,* Major Violations, *p. 99*)

47. The witness' testimony fails to reveal clear and convincing evidence of *"unethical and immoral behavior"*, *"incompetence"*, *"neglect of duty"* (duty to do what?), and the *"failure to perform duties in a professional manner"*.

48. **Witness 4: Ms. Shelinda Harris:** The witness has no college degree; she has no profession. She distinguished herself in the plaintiff's class by receiving a D for

9

take home, open book exam. Ms. Harris instantly became highly critical of the plaintiff's teaching because he gave an example of deviant behavior which offended her sensibilities, and later those of the plaintiffs' for whom she became an instant celebrity. It demands some explanations:

49. Several years ago, one of the plaintiff's students came to his class in skimpy shorts, took the front seat in the classroom, and spread her legs so wide that her pubic hair became visible. The plaintiff cited this fact as an example of deviant behavior when he lectured about the branch of sociology that examines social deviance.

50. The witness, and later the defendants, declared plaintiff's example as the proof of his "*unethical and immoral*" behavior.

51. And yet, it is not! **Deviance** is defined in sociology as "any action, belief, or human characteristic that is considered a violation of group norms, by a large number of members of society or social group for which the violator is likely to be censured or punished." (See George Ritzer, *Introduction to Sociology*, Los Angeles: Sage 2016: p. 176).

52. Speaking in class of the student's deviant behavior was not unethical, immoral, or unprofessional. In sociology facts are not unethical or immoral. *"…Anything pertaining to relationships between organisms, particularly human organisms, or to products of such relationships…the scientist should consider…"* He should consider "facts as things" and "things as phenomenon that can be known from without only". (See Thomas Ford Hoult, *Dictionary of Modern Sociology*, 1977: p.298) Hence, for sociologist human behavior that occurs outside of the individual is a fact, and facts are things. As such, they have no morals or ethical standards. The student, and the defendants seem incapable of understanding this simple truth.

53. This witness makes unsubstantiated accusations of verbally abusive "interaction with students". But what students? Their names and times are not given. What is notable, Ms. Harris does not claim that plaintiff was verbally abusive toward her.

10

54. In conclusion, witness 4 does not provide clear and convincing evidence of *"unethical and immoral"* behavior, *"neglected duty"*, of "incompetence" or the proof of *"failure to perform duties in a professional manner"*.

55. **Dr. Harrell, (former dean): Witness 5:** Her references to "multiple grievances" are too general *unauthenticated(!)* statements that do not rise to the level of misconduct.

56. Accusations of "lack of clarity in on-line classes" are fabrications. Syllabi from that period are still available. There were no complaints to plaintiff on the subject.

57. References to special accommodations for Ms. Gardner are misleading. The student missed more classes than maximum allowed in the first two months of the semester. *She never asked the plaintiff for any accommodations.* No adverse action was taken against her. Since professor's decisions about special accommodations for students are *discretionary,* if adverse, they do not rise to the level of misconduct(!)

58. Dr. Harrell's accusations of "unprofessionalism" and "lack of courtesy", or of "verbal abuse" are too general. They are not substantiated by any identifiable facts, and therefore, are empty.

59. When asked by the plaintiff some time ago to explain the meaning of the word "professionalism", Ms. Harrell could not do it. She asked the plaintiff to explain the concept to her.

60. Threatened writing? Where is the proof? In plaintiff's last email to this witness, after numerous harassing messages, he wrote: "... *I'd like to remind you that I have tenure, and I know how to defend it. Your frequent and arbitrary attacks on my professionalism tell me that you do not know it. So, take it easy. I can do what you can do, but with much higher sophistication."* (See Exhibit 7: Email of Nov.3, 2021)

11

61. This, Dr. Harrell took as a threat. But *La. Civil Code, Art.1962* says: *"A threat of doing a lawful act, or a threat of exercising a right does not constitute duress."* (!)

62. Disrespectful to colleagues? What colleagues? Let them speak for themselves. What are their names? Dr. Harrell is lying.

63. The testimony of this witness lacked proof of *"unethical and immoral behavior"*, of *"neglected duty"*, of *"incompetence"* (Dr. Harrell admitted some time ago that she has not a clue what sociology is), and of clear and convincing evidence of *"failure to perform duties in a professional manner"*.

64. **Witness 6: Dr. Ford:** This witness was incapable of providing name of the students who were afraid of the plaintiff. It is not unusual for students to fear professors with reputation for tough grading. But this is not a misconduct!

65. Plaintiff has *never* been invited to the informal panel meeting to his knowledge.

66. Plaintiff avoided talking to this witness because of his rude and insulting manner with which he treated the plaintiff.

67. This witness lied to this panel about the refusal of the plaintiff to administer annual teaching evaluations. Some of them are available in plaintiff's files, others in the Institutional Research Office (attempts to withdraw them from there were prevented by SUNO campus police on January 10, 2023.)

68. In recent years, senior faculty members were not required to offer teaching evaluations in their classes, although teaching evaluations in the narrative form were submitted to the plaintiff by his students - spontaneously. (Exhibit 8)

## CONCLUSIONS:

69. The Investigatory Panel has failed to find **clear and convincing evidence** of misconduct on the part of the plaintiff that would justify his dismissal and revocation of tenure.

70. And yet, *"The burden of proof that adequate cause exists rests on the institution and shall be satisfied only by clear and convincing evidence in the record considered as a whole."* (*Faculty Handbook, p. 58*)

12

71. By engaging in an effort to force Dr. Odynocki to resign from his tenured position by bullying and harassing him, SUNO, Dr. Gregory Ford, Dr. James Ammons, and Dr. Dennis J. Shields have intentionally violated Dr. Odynocki's civil rights guaranteed by *Louisiana Commission on Human Rights Act (LADEA) and the Age Discrimination in Employment Act of 1967(ADEA).*

72. Plaintiff requests that the Court declare the conduct of SUNO, Dr. Gregory Ford, Dr. James Ammons, and Dr. Dennis Shields to be discriminatory in nature, that defendants have violated Dr. Odynocki's rights under *Louisiana Commission on Human Rights Act,* and that plaintiff should be reinstated to his position in the department of social sciences at SUNO, and that he should be awarded back pay and benefits incurred as a result of his dismissal.

73. Dr. Boris Odynocki demands a jury to try all claims triable by jury.

   **WHEREFORE,** Dr. Odynocki prays that this Court:

   a). declare the conduct of SUNO, Dr. Gregory Ford, Dr. James Ammons, and Dr. Dennis Shields to be in violation of his civil rights;

   b). reinstate Dr. Odynocki to his full - time tenured position and to enjoin SUNO from engaging in such a conduct in the future;

   c). award Dr. Odynocki back pay and benefits up to the date of reinstatement; and/or d). order defendants to comply with the rule that obliges the following: "notice of termination shall be provided to a tenured member of the faculty no less than the equivalent of one academic year prior to the effective date of the termination of employment."

Respectfully submitted by:

*Boris Odynocki*

Dr. Boris Odynocki
234 Goldenwood Dr.
Slidell, La 70 461
985-285-0325
Email: odynock@aol.com

A TRUE COPY

DEPUTY CLERK CIVIL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LA

13

***PLEASE SERVE:***

1. Dr. Dennis J. Shields
   President-Chancellor
   Southern University System
   J.S. Clark Adm. Bldg.
   4th Floor President's Office
   Baton Rouge, La 70813

2. Dr. James Ammons
   Chancellor
   Southern University at New Orleans
   6400 Press Dr.
   New Orleans, La 70125

3. Southern University at New Orleans
   6400 Press Dr.
   New Orleans, La 70126

4. Dr. Gregory Ford
   Vice-Chancellor for Academic Affairs
   6400 Press Dr.
   New Orleans, La 70126

5. Jeff Landry, Attorney General
   Louisiana Department of Justice
   1885 N. 3d Street
   Batton Rouge, La 70802